J. ALFRED LEVERT II AND MARTHA F. LEVERT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Levert v. Commissioner
Docket Nos. 533-85; 42103-85; 48623-86[1]
United States Tax Court
T.C. Memo 1989-333; 1989 Tax Ct. Memo LEXIS 338; 57 T.C.M. (CCH) 910; T.C.M. (RIA) 89333; July 13, 1989
Gerald H. Litwin, for the petitioners. Albert G. Kobylarz, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies and additions to tax against petitioners: Additions to Tax Under Sections [2]
Year
Deficiency 6653(a)
6653(a)(1)
6653(a)(2)
6661
1980
$ 165,718.00
$ 8,286
--    --
--
1981
271,879.00
--
$ 13,594.00
*
--
1982
44,916.70
--
2,245.84 **
$ 4,491.67
Respondent also determined that petitioners were liable for increased interest under section 6621(c) (formerly designated section 6621(d)) *341 with respect to a portion of the 1981 underpayment and the entire 1982 underpayment. After concessions, the issues presented are (1) whether, and to what extent, petitioners incurred mining exploration expenditures that are currently deductible under section 617, (2) the proper year for deducting any such expenditures under the accrual method of accounting, and (3) whether petitioners are liable for the determined additions to tax and increased interest. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners are married and resided in New Orleans, Louisiana, when they filed their petitions. Petitioners have a significant background in the business of exploring for various mineral resources, including natural gas, oil, and metals. After graduating from Tulane University in 1966, petitioner J. Alfred Levert II ("Mr. Levert") was employed by a brokerage firm in New Orleans. As manager of the firm's commodities department, Mr. Levert worked on gold and silver transactions. After some ten years at the firm, Mr. Levert left to enter the "minerals *342 business." He formed a partnership with Bill Broadnax for the purpose of oil and gas exploration. Since 1976, Mr. Levert has participated in numerous other partnerships engaged in mineral resources exploration. Mr. Levert and petitioner Martha F. Levert ("Mrs. Levert") own and operate roughly 30 mineral properties. Prior to 1980, petitioners made a major discovery of natural gas. In 1980, petitioners decided to diversify their interests by increasing their investment in liquid petroleum and "hard minerals," i.e., metals. In the spring of 1980, petitioners began negotiations with Mr. Lawrence T. Atkinson. Mr. Atkinson is the president of Combined Metals Reduction Company ("Combined Metals") and its subsidiaries. Combined Metals is a mining company engaged in exploration and processing. Combined Metals and its subsidiaries have facilities in Fish Lake Valley, Nevada, including an extensive library, laboratories, shops, warehouses, heavy equipment, and aircraft. Mr. Atkinson had acquired a controlling stock interest in Combined Metals in 1974. Mr. Levert had known Mr. Atkinson since that time, and the two men had participated in various business ventures together. In their *343 negotiations with Mr. Atkinson, petitioners sought exploration services. Their goal was to acquire reserves of gold or silver and sell the reserves to a buyer capable of processing ore. During negotiations, petitioners attempted to obtain the maximum "exploration area" for a predetermined contract price. Petitioners did not receive tax advice respecting any proposed transaction with Mr. Atkinson. On December 30, 1980, petitioners entered into an "Exploration Agreement" ("the 1980 contract") with Dallas Mines Nevada, Inc. ("the contractor"), which is a second-tier subsidiary of Combined Metals. Although Mrs. Levert alone signed the 1980 contract, petitioners considered themselves members of "Inyo Exploration," a joint venture, and Mrs. Levert signed the 1980 contract on behalf of Inyo Exploration. The 1980 contract required the contractor to perform various services within an exploration area consisting of portions of Inyo and San Bernardino Counties, California. The 1980 contract described all of the specified services as "Exploration Services" and further classified the services into three groups, "Phase 1 - Overview of Exploration Area," "Phase 2 - Appraisal of Selected Targets, *344 " and "Phase 3 - Acquisition of Mineral Rights." Phase 1 services included "compilation of published studies, reports, geologic surveys and production records (if any) with respect to the Exploration Area," review of various aerial and satellite photographs, and some mapping. Phase 2 services included surface and underground mapping, and sampling. Phase 3 services included assisting petitioners in obtaining "mineral rights" to those portions of the exploration area that demonstrated "economic potential." The 1980 contract imposed no deadline for the performance of the "exploration services" but estimated that Phases 1 and 2 would be completed within 200 days. The 1980 contract required the contractor to notify petitioners after completing each of Phases 1 and 2. The 1980 contract also provided, "Contractor shall not be required to proceed with the next following phase until Owner [petitioners] shall have given Contractor a written 'Notice to Proceed'." Petitioners agreed to pay the contractor $ 243,750 for the specified services. Of the foregoing amount, petitioners agreed to pay $ 18,750 in cash, while the balance of the contract price was represented by a promissory note *345 for $ 225,000, bearing 12 percent interest, and payable in installments of $ 18,750 due every four months beginning April 30, 1981. Roughly one year later, on December 8, 1981, petitioners entered into a second "Exploration Agreement" ("the 1981 contract"). The 1981 contract specified a different contractor, Dallas Mines, Inc., a subsidiary of Combined Metals. (Hereinafter, Dallas Mines Nevada, Inc., and Dallas Mines, Inc., will both be referred to as "the contractor.") Mrs. Levert signed the 1981 contract on behalf of Inyo Exploration. The 1981 contract contained terms essentially identical to those in the 1980 contract. Some distinctions, however, merit mention. The 1981 contract involved a different exploration area, specifically, a portion of Esmeralda County, Nevada. The 1981 contract estimated that Phases 1 and 2 would be completed within 600 days. Like the 1980 contract, the 1981 contract required the contractor to advise petitioners of the completion of each of Phases 1 and 2. The 1981 contract, in language similar but not identical to that contained in the 1980 contract, further provided, "Contractor shall not be required to proceed with the next following phase *346 until owner shall have given contractor a written 'Notice to Proceed' specifying the tasks for which Contractor will be additionally compensated." Petitioners agreed to pay the contractor $ 160,000 for the specified services. Of the foregoing amount, petitioners agreed to pay $ 20,000 in cash, while the balance, $ 140,000, was represented by a promissory note calling for seven quarterly installments commencing on July 1, 1982, and bearing 12 percent interest. Petitioners also agreed to pay additional compensation to the contractor for certain services, including the staking of claims and the negotiation of leases and purchases of "mineral lands." After the contractor began performing its duties, petitioners visited a number of mining properties and the contractor's facilities in Nevada. Petitioners communicated with the contractor regularly, most frequently by telephone. The contractor completed performance of the 1980 and 1981 contracts to petitioners' satisfaction. While performing its duties, the contractor commercially exploited a number of "mine dumps" on behalf of petitioners. Mine dumps are piles of waste created by exploratory digging. Rising metal prices and an *347 extraction process known as "cyanization" had increased the attractiveness of exploiting dumps. The contractor acquired 300 tons of dump ore on a claim named "Beagle Sam" in exchange for exploration results. In a letter dated April 9, 1981, Mr. Atkinson told Mr. Levert that the ore most likely would produce ten ounces of silver per ton. In a letter dated December 14, 1982, Mr. Atkinson told Mr. Levert that petitioners could acquire an ore stockpile located on a claim named "High Hopes" in exchange for "road work" performed by the contractor. In a letter dated February 3, 1983, Mr. Atkinson told Mr. Levert about two dumps at a claim named "Jeannette" and predicted "some mining profit." Mr. Atkinson also referred to dumps at claims named "Wildhorse" and "Nina." In a letter dated March 24, 1983, Mr. Atkinson agreed to waive interest accruing after January 1, 1983, on the balance owed pursuant to the 1980 contract. According to the letter, interest would again begin to accrue upon the contractor's resumption of ore processing and the resulting recovery of metal by petitioners. The letter stated that petitioners owned one-half of 2,100 ounces of silver and 12 ounces of gold "in solution" *348 (undergoing processing). The letter also stated that the "Jeannette ore" consisted of 220 tons, containing roughly 13 ounces of gold and 5,900 ounces of silver, and that the ore would be processed soon. The following table sets forth metal prices reported by the Wall Street Journal on various dates: Date
Gold (per ounce)
Silver (per ounce)
February 4, 1980
$ 671.40
$ 32.67
September 8, 1982
458.00
8.78
March 24, 1983
415.50
10.49
In 1987, Mr. Atkinson prepared an affidavit which itemizes the services performed for petitioners pursuant to the 1980 and 1981 contracts. The affidavit sets forth, with respect to each separate mining property, labor and expenditures devoted to each service. Thus, for example, the affidavit recites that "5 man-days" of sampling were performed with respect to the "Jeannette property." The affidavit also classifies most of the itemized services under Phases 1, 2, or 3. Mr. Atkinson also prepared a spread sheet based upon his affidavit. The spread sheet allocates costs totalling $ 348,042 among 18 categories. The categories correspond to those set forth in Mr. Atkinson's affidavit. The spread sheet *349 also apportions the costs among 18 separate mining properties. Mr. Atkinson prepared his affidavit and the spread sheet in order to facilitate any computation of "recapture" of exploration costs. [3]
The following table is based upon Mr. Atkinson's affidavit and spread sheet and allocates the contractor's costs to various items: Item  Cost  Phase 1  Collection of Published Data  $ 20,650
Aerial Reconnaissance  13,436
Surface Reconnaissance  95,850
Phase 2  Surface Mapping - Field  20,850
Surface Mapping - Office  4,280
Underground Mapping - Field  36,800
Underground Mapping - Office  3,940
Sampling  27,790
Phase 3  Records Search  2,316
Claims Staking  8,640
Recordation  2,670
Landman  3,250
Unclassified Services and Costs  Access  44,750
Loading and Transportation  30,024
Taxes [4]  146
Assessment Work  11,600
Metallurgical Testing  10,250
Client Services  10,800
$ 348,042 *350 Pursuant to the 1980 and 1981 contracts, petitioners paid the contractor the following amounts on the indicated dates: Amount
Date of Payment
$  18,750.00
December 30, 1980
18,750.00
April 30, 1981
18,750.00
September 10, 1981
20,000.00
December 10, 1981
18,750.00
December 10, 1981
30,511.64
August 31, 1982
20,000.00
September 21, 1982
18,750.00
September 21, 1982
25,734.24
December 31, 1982
40,000.00
December 31, 1982
25,000.00
September 30, 1985
47,500.00
November 25, 1986
120,000.00
December 30, 1986
Total
$ 422,495.88
OPINION On their return for taxable year 1980, petitioners deducted the $ 243,750 they agreed to pay the contractor pursuant to the 1980 contract. On their return for taxable year 1981, petitioners deducted $ 156,642 of the $ 160,000 they agreed to pay the contractor pursuant to the 1981 contract. The record offers no explanation for the discrepancy between the deducted amount and the contract price. Section 617 Exploration Expenditures
*351 The first issue we must decide is whether, and to what extent, petitioners incurred currently deductible mining exploration expenditures that support the foregoing deductions. The other issue presented, which we will address later, concerns the proper year for deducting any such expenditures under the accrual method of accounting. With respect to the first issue, petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners cite section 617 in support of their claimed deductions. In pertinent part, section 617(a)(1) provides as follows: (1) General Rule. -- At the election of the taxpayer, expenditures paid or incurred during the taxable year for the purpose of ascertaining the existence, location, extent, or quality of any deposit of ore or other mineral, and paid or incurred before the beginning of the development stage of the mine, shall be allowed as a deduction in computing taxable income. * * * Respondent contends that a substantial portion, if not all, of the services performed by the contractor were not "for the purpose of ascertaining the existence, location, extent, or quality" of any mineral deposit *352 and that petitioners improperly deducted the prices of the 1980 and 1981 contracts to the extent the prices represented consideration for such other services. Before addressing which expenditures are currently deductible under section 617, it is helpful to note two expenditures which do not qualify for such deductibility. First, section 1.617-1(b)(4), Income Tax Regs., provides, "Section 617 is not applicable to costs of exploration which are reflected in the amount which the taxpayer paid or incurred to acquire the property." Citing the foregoing provision, we have held, "The costs of staking, mapping, and recording a claim would be excluded from deductible expenditures as the costs of acquiring the claim." Parker v. Commissioner, 86 T.C. 547, 558 (1986). Second, section 617(a)(1) states, This subsection shall not apply to expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation provided in section 167, but allowance for depreciation shall be considered, for purposes of this subsection, as expenditures "paid or incurred." The question of which expenditures are deductible under section *353 617 has also been addressed, although less precisely. The regulations cite drilling as an example of exploration activity. Sec. 1.617-1(a), Income Tax Regs. The regulations also state that section 617 covers "costs paid or incurred by the taxpayer for exploration undertaken directly or through a contract." (Emphasis supplied.) Thus, the fact that petitioners incurred no direct exploration costs is irrelevant. In Kilroy v. Commissioner, T.C. Memo. 1973-7, we noted that legislative history described "drilling" and "crosscutting" as examples of exploration activity (citing S. Rept. No. 91-552 (1969), 1969-3 C.B. 542). We also held that incidental costs such as "telephone, automobile, office-in-home expenses and the like" were not deductible in the absence of direct exploration costs. In a later opinion, Kilroy v. Commissioner, T.C. Memo. 1980-489, the taxpayer had engaged in exploratory core drilling, and we therefore allowed his deduction of office expenses which were "reasonably connected with preparations for extracting ore." Although Estate of DeBie v. Commissioner, 56 T.C. 876, 892 (1971), has been cited for *354 the proposition that costs "reasonably connected with preparations for extracting ore" fall within the ambit of section 617, the case involved the issue of whether certain costs were deductible development costs, or exploration costs, which then had to be capitalized to the extent they exceeded a specified amount. We held that the costs in issue were development expenditures because they were "reasonably connected" to preparations for ore extraction. While we recognize that revenue rulings represent only respondent's position of specific factual situations rather than substantive authority ( Stark v. Commissioner, 86 T.C. 243, 250-251 (1986)), one ruling deserves mention. Revenue Ruling 70-287, 1970-1 C.B. 146, states Exploration expenditures include those expenditures paid or incurred for geological and geophysical investigations, reconnaissance, surveying, testpitting, trenching, drilling, driving of exploration tunnels and adits, and similar types of work. However, the physical means or method by which the work is performed is not controlling in distinguishing exploration from development. [Emphasis supplied.] The last sentence of *355 the ruling indicates that the purpose for which work is performed, rather than the nature of the work, determines whether section 617 applies. Thus, a taxpayer might drill in order to explore but he also might drill in order to extract ore. Only the former activity should give rise to deductions under section 617, because the statute expressly refers to expenditures "for the purpose" of exploration. In the instant case, although the 1980 and 1981 contracts are both labelled "Exploration Agreement," we are not foreclosed from determining what services were performed for petitioners. Parker v. Commissioner, supra at 559; Snyder v. Commissioner, 86 T.C. 567, 578-579 (1986). [5] Any other rule would give rise to deductions under section 617 through the simple expedient of affixing a particular label to an agreement. The record contains a fairly specific guide to the services performed by the contractor. Mr. Atkinson's affidavit and spread sheet allocate the contractor's costs to various services and other items. The affidavit and spread sheet thus are helpful in determining *356 what portions of the 1980 and 1981 contract prices represent consideration for exploration work. The affidavit and spread sheet classify certain services as Phase 3 services. The 1980 and 1981 contracts both define Phase 3 as the "Acquisition of Mineral Rights." Because costs of acquiring mineral rights do not qualify under section 617 (sec. 1.617-1(b)(4), Income Tax Regs.), any consideration for Phase 3 services may not be deducted under section 617. According to our calculations, roughly five percent ($ 16,876 divided by $ 348,042) of the costs allocated by Mr. Atkinson are attributable to Phase 3 services. Consequently, we hold that the same percentage of the 1980 and 1981 contract prices are not deductible under section 617. [6]
*357 The affidavit and spread sheet group other services under Phases 1 and 2. We find that Phase 1 and 2 services were "reasonably connected" to ascertaining the "existence, location, extent, or quality" of ore deposits. The collection of published data, aerial and surface reconnaissance, surface and underground mapping, and sampling were all in furtherance of petitioners' goal of locating reserves. We therefore hold that consideration for those services is deductible under section 617. According to our calculations, roughly 64 percent ($ 223,596 divided by $ 348,042) of the costs allocated by Mr. Atkinson are attributable to Phase 1 and 2 services. Consequently, we hold that the same percentage of the 1980 and 1981 contract prices are deductible under section 617. Other items which the affidavit and spread sheet do not classify under Phases 1, 2, or 3 remain for our consideration. Of those items, "Assessment Work" clearly pertains to maintaining legal title to mineral properties rather than exploration, and we accordingly hold that consideration for assessment work is not deductible under section 617. We also hold that services described as "Access," "Loading and Transportation, *358 " and "Metallurgical Testing" were performed for the purpose of extracting precious metal from dump ore, not exploration. Therefore, the services do not entitle petitioners to deductions under section 617. We base our holding on the record, which discloses that petitioners had a serious interest in processing precious metal from mine dumps. Although their primary goal may have been to locate reserves of gold or silver, petitioners clearly sought some recovery from the extraction of precious metal from dumps, perhaps as a means of reducing their exploration costs. The contractor's letter to Mr. Levert dated March 24, 1983, is most significant. In that letter, the contractor agreed to waive interest accruing under the 1980 contract from January 1, 1983, until the recovery of metal from dump processing. Petitioners did not pay anything to the contractor between December 31, 1982, and September 30, 1985. We find that the suspension of payments was likely due to the contractor's agreement to waive interest accruing under the 1980 contract. Although we do not infer that petitioners conditioned payment upon successful exploitation of the dumps, the letter proves that the parties viewed *359 metal extraction from dumps as an important part of the contractor's performance. Moreover, the record contains several letters from the contractor which referred to one or more dumps on various properties. Petitioners exchanged exploration results and road work for ore from dumps. In view of the foregoing, we reject petitioners' contention that the recovery of gold and silver from ore was an "incidental" benefit of the contractor's exploration work. Instead, we find that extraction of metal was the primary purpose for certain services. Specifically, those services described as "Access," "Loading and Transportation," and "Metallurgical Testing" furthered petitioners' goal of recovering metal from dumps. The contractor performed road work to gain access to dumps. We agree with respondent's expert that exploration would not have necessitated such work. The contractor also loaded and transported dump ore, and processed the ore through metallurgical testing. Although some knowledge of the mining properties may have been gained from the foregoing process, we find that petitioners' goal and the contractor's focus was extraction of precious metals. Furthermore, the road work constitutes *360 the sort of capital improvement which section 617(a)(1) excludes from the purview of the statute. D. Loveman & Son Export Corp. v. Commissioner, 34 T.C. 776, 806-807 (1960), affd. 296 F.2d 732 (6th Cir. 1961). The affidavit and spread sheet indicate that the contractor expended $ 146 for "Taxes." Petitioners do not argue that section 164 entitles them to a deduction with respect to this cost. Moreover, petitioners offered no evidence that they incurred the sort of taxes deductible under section 164 or any indication of the year of any such accrual. Accordingly, we deny any deduction with respect to this cost. Rule 142(a). Welch v. Helvering, supra at 115. According to our calculations, the unclassified services and items which we have held nondeductible under section 617 account for approximately 28 percent of the contractor's total costs ($ 96,770 divided by $ 348,042) and we therefore disallow the same percentage of the 1980 and 1981 contract prices. The remaining three percent of the contractor's costs are attributable to "Client Services." We find that an unascertainable portion of this overhead was related to qualified *361 exploration work. [7] Accordingly, bearing heavily against petitioners because the inexactitude is of their own making, we hold that 1.5 percent (50 percent of three percent) of the 1980 and 1981 contract prices are deductible under section 617. Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). Concord Consumers Housing v. Commissioner, 89 T.C. 105, 124-125 (1987). The report of respondent's expert is based almost entirely upon the affidavit and spread sheet prepared by Mr. Atkinson. We view our findings as essentially consistent with that report, which concedes that 50 percent of the contract prices may be classified as exploration expenses. In sum, we hold that 65.5 percent of the 1980 and 1981 contract prices are deductible under section 617, because those portions of the contract prices represent consideration for exploration work. The remaining portions of the contract prices (34.5 percent) are not exploration expenditures, and because petitioners have not offered any alternative justification for their deduction, they must be disallowed. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). *362 [8]
We do not purport to make an exact allocation of the contract prices. For example, some of the access work may have furthered exploration, while some of the office mapping may have furthered title acquisition. See Parker v. Commissioner, 86 T.C. at 558. We are certain, however, that petitioners contracted for both exploration work and other, nonqualified services, and Cohan v. Commissioner, supra, requires that we make as precise an allocation as possible. The record simply does not permit greater precision. Timing of Deductions Under the Accrual Method
We must next decide whether petitioners may deduct allowable exploration expenditures in the years in which they entered into the 1980 and 1981 contracts, i.e., 1980 and 1981, respectively, or in later years when the contractor performed promised services. *363 Respondent does not contest that InyoExploration is entitled to use the accrual method of accounting in computing its taxable income. Under the accrual method, "an expense is deductible for the taxable year in which all events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." Sec. 1.461-1(a)(2), Income Tax Regs. In United States v. General Dynamics, 481 U.S. 239, 243 (1987), the Supreme Court stated the following respecting the "all events" test: It is fundamental to the "all events" test that, although expenses may be deductible before they have become due and payable, liability must first be firmly established. This is consistent with our prior holdings that a taxpayer may not deduct a liability that is contingent. Accord United States v. Hughes Properties, Inc., 476 U.S. 593 600-601 (1986). In the instant case, petitioners contend that their liabilities under the 1980 and 1981 contracts became fixed when they entered into the contracts. Respondent, on the other hand, contends that the liabilities did not become fixed until the contractor completed the services *364 specified in the contracts. Initially, we hold that respondent bears the burden of proof on this issue. The notices of deficiency do not raise issue with the timing of petitioners' deductions. In fact, it appears that respondent first raised the issue shortly prior to trial, in his trial memorandum. Respondent's new theory for disallowance required petitioners to adduce facts different from those needed to refute the theories of the statutory notices. For example, the period over which the contractor completed its performance became relevant under the new theory. Accordingly, respondent has raised a "new matter" with respect to which he must bear the burden of proof. Rule 142(a); Achiro v. Commissioner, 77 T.C. 881, 890 (1981); Estate of Falese v. Commissioner, 58 T.C. 895, 899 (1972). Levin v. Commissioner, 21 T.C. 996 (1954), affd. 219 F.2d 588 (3d Cir. 1955), sets forth the controlling principle. In that case, a husband and wife were partners in a business which manufactured and sold food products. On December 12, 1946, the partnership entered into an advertising contract which provided for advertisement *365 of one of the partnership's products. The original contract had a two-year term. The taxpayers agreed to pay the advertiser $ 750 a month for its services. On December 17, 1946, the partnership received an invoice for the period ending on December 4, 1947. The partnership, computing its income on an accrual basis, deducted the full amount of the invoice in calendar year 1946. The Commissioner disallowed the deduction to the extent it represented consideration for services rendered after 1946. We sustained the Commissioner's position, holding, "Under the contract of December 1946 the * * * [taxpayers] incurred no liability but merely agreed to become liable to pay in the event the future services called for were performed." Levin v. Commissioner, supra at 998. The appellate court, in affirming our opinion, further explained, Rendition of the services was a condition precedent to any obligation of the partnership to pay. Where the contract, as here, contains mutually dependent promises, liability under it is contingent upon performance or tendered performance. Restatement, Contracts Sec. 270 (1932) et seq. 219 F.2d at 589. Accord *366 Hallack & Howard Lumber Co. v. Commissioner, 18 B.T.A. 954, 957-958 (1930). [9]
Applying the foregoing principles to the instant case, petitioners did not become unconditionally liable to the contractor for $ 243,750 upon entering into the 1980 contract. Neither did they become unconditionally liable for $ 160,000 upon entering into the 1981 contract. Rather, petitioners' liabilities under both contracts depended upon completion of the promised services, just as the taxpayers' obligation in Levin was conditioned upon performance by the advertiser. In pertinent part, the 1980 contract provided, "This Agreement shall commence on the date hereof and shall be for a period of time required for the performance of all of the services hereunder by Contractor * * *." Moreover, the parties estimated that Phases *367 1 and 2 would be completed within 200 days. The 1981 contract contained identical language, except that the parties estimated that 600 days were needed to complete Phases 1 and 2. Given the foregoing language, we reject any suggestion that petitioners would have been required to make payments to the contractor even if the contractor had failed to commence work or failed to make progress towards completion of its work. Thus, petitioners' liabilities under the 1980 and 1981 contracts were conditional. Further, petitioners did not become unconditionally liable for the full amounts of the contract prices until the contractor completed, at least in substantial part, its duties under the contracts. Until that time, the possibility remained that a "material failure" of performance would excuse petitioners' refusal to pay. We do not mean to suggest that every contract for the performance of services contains constructive conditions. Our inference of constructive conditions in the instant case is based upon the intent of the parties as gleaned from the contracts, and from surrounding circumstances, including the fact that payments under the contracts were deferred until the contractor *368 processed ore from the dumps, and upon the order of the parties' respective performances. 6 Williston, Contracts, secs. 824, 829, pp. 46-47, 74 (1962). We find that the parties contemplated significant performance by the contractor prior to the time petitioners were required to make full payment of the contract prices. Based upon all of the facts and circumstances, we find that petitioners' liabilities under both the 1980 and 1981 contracts were conditional. The fact that petitioners gave the contractor promissory notes does not affect our conclusion. Under Nevada law, the notes are negotiable instruments. In the hands of the contractor, they are subject to those defenses "available in an action on a simple contract." Nev. Rev. Stat. Ann. secs. 3104, 3306 (Michie 1986). For the same reasons we looked beyond petitioners' labelling of the 1980 and 1981 contracts as "Exploration Agreements," petitioners are not entitled to convert unaccrued expenditures to accrued ones by reciting their obligations in notes rather than agreements. As previously noted, respondent bears the burden of proof respecting the tax accounting issue. Mr. Atkinson testified credibly that the contractor's *369 performances of the 1980 and 1981 contracts were completed in 1981 and 1982, respectively, i.e., the years following the execution of each contract. Respondent did not impeach Mr. Atkinson's testimony on the issue. While there is some evidence that minimal assessment work and dump processing may have occurred in later years, we find that Phases 1 and 2 of both contracts were completed in the years following their execution and that the contractor substantially performed its obligations under both contracts in those years. In sum, we hold that petitioners may deduct 65.5 percent of the cash down payments paid in 1980 and 1981 in those years. Petitioners must, however, deduct the remaining allowable portions of the 1980 and 1981 contract prices in 1981 and 1982, respectively, because petitioners' liabilities under the contracts became fixed in those years. Additions to Tax and Increased Interest
Respondent determined that petitioners were liable for additions to tax under sections 6653(a) and 6661, and for increased interest pursuant to section 6621(c). Respondent's opening and reply briefs, however, fail to discuss the applicability of the additions or increased interest. *370 Nor does respondent's opening brief state that the additions and increased interest are in issue in the instant cases. Given the foregoing, we deem respondent to have conceded the additions and increased interest. Rule 151(e)(2) and (4). [10]
To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. These consolidated cases stem from separate petitions filed by petitioners in response to separate statutory notices for different taxable periods.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the relevant years, and all Rule references are to the Tax Court Rules of Practice and Procedure. * Plus 50 percent of the interest on $ 271,879.00. ** Plus 50 percent of the interest on $ 44,916.70.↩
3. Once a mining property becomes productive, exploration expenditures attributable to that property have to be recaptured by either including the expenditures in gross income or by forgoing depletion to the extent of the expenditures. See sec. 617(b)(1).↩
4. Local law requires that some nominal amount of work be performed on a claim annually in order to maintain title.↩
5. See Baxter v. Commissioner, T.C. Memo. 1985-415↩.
6. Arguably, the express terms of the 1980 and 1981 contracts prevent petitioners from contesting that at least a portion of the contract prices represents payment for nondeductible acquisition costs. Sonnleitner v. Commissioner, 598 F.2d 464, 467↩ (5th Cir. 1979), affg. a Memorandum Opinion of this Court ("strong proof" required to overcome contract allocation of consideration among assets purchased). The parties did not, however, raise the issue.
7. Kilroy v. Commissioner, T.C. Memo. 1980-489↩.
8. Petitioners make passing reference to section 616, which permits the deduction of expenses for the development of a "mine or natural deposit." Section 616(a), however, is unavailable unless "ores or minerals in commercially marketable quantities" have been ascertained. The record offers no evidence of such a discovery.↩
9. Under current law, section 461(h)(2)(A)(i) would postpone petitioners' deductions until the contractor's performance. According to the statute, the "all events" test is not satisfied until "economic performance," i.e., the rendition of services, occurs. The provision became effective on July 18, 1984. Pub. L. 98-369, sec. 91(g), 98 Stat. 494, 608.↩
10. Remuzzi v. Commissioner,T.C. Memo. 1988-8; Strasser v. Commissioner,T.C. Memo. 1986-579↩, n.13.