T.C. Memo. 2020-156

UNITED STATES TAX COURT

LISA A. BRUNO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15525-18.                    Filed November 16, 2020.

<u>Thomas E. Crice</u>, for petitioner.

<u>Carlton W. King</u> and <u>Nina P. Ching</u>, for respondent.

MEMORANDUM OPINION

LAUBER, <u>Judge</u>:  With respect to petitioner's Federal income tax for 2013, 2014, and 2016, the Internal Revenue Service (IRS or respondent) determined deficiencies of $15,438, $20,409, and $12,527, respectively, plus additions to tax for 2013 and 2014.  The sole issue remaining for decision concerns petitioner's claim

[*2] that she sustained in 2015 a deductible theft loss of approximately $2.5 million. She contends that this loss resulted from her ex-husband's refusal to transfer marital property awarded to her in 2008 by order of a Connecticut divorce court. Petitioner contends that this theft loss generated a net operating loss (NOL) in 2015, which she seeks to carry forward to 2016 and back to 2013 and 2014. Petitioner has conceded all other issues, including her liability for late-filing additions to tax under section 6651(a)(1) on any deficiencies redetermined for 2013 and 2014.[1] Finding that petitioner has not established that she sustained a theft loss in 2015 (or in any other year at issue), we resolve this question in respondent's favor.

Background

The parties have submitted the case for decision without trial under Rule 122. Relevant facts have been stipulated or are otherwise included in the record. See Rule 122(a). Petitioner resided in Connecticut when she filed her petition.

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*3] A.    Connecticut Divorce Proceedings

Petitioner married Stephen J. Bruno in 1987.  Mr. Bruno had a successful career in the financial sector and by 2005 earned annual income of $2.1 million. In that year, following petitioner's discovery that he was having an affair, Mr. Bruno filed for divorce in Connecticut Superior Court (divorce court).  The divorce court dissolved the marriage by a memorandum of decision dated March 17, 2008 (divorce decree).

The divorce decree directed an equitable distribution of the Brunos' marital property.  At that time Mr. Bruno apparently possessed most of these assets, and he was directed to transfer specified property to petitioner.  But petitioner also possessed some marital property, including a bank account titled in her name and real property at 38 Pumping Station Road, Ridgefield, Connecticut (Pumping Station property).  The divorce decree directed that the latter assets were to be liquidated and the proceeds split between petitioner and Mr. Bruno.

On Mr. Bruno's appeal the Connecticut appellate court remanded several issues but left intact the general contours of the property distribution set forth in the divorce decree.  See Bruno v. Bruno, 31 A.3d 860, 872 (Conn. App. Ct. 2011). Mr. Bruno transferred no marital property to petitioner following conclusion of the appellate and remand proceedings.  Petitioner contends that Mr. Bruno under the

[*4] divorce decree owes her the following amounts, which constitute the theft loss she claims:

| Claim | Petitioner's interest |
|---|---|
| Charles Schwab joint account | $1,292,609 |
| Value asset management shares | 12,500 |
| Net earned payments | 207,453 |
| Charles Schwab IRA | 320,472 |
| Personal property (electronics) | 108,600 |
| Personal property (furniture) | 334,000 |
| Unpaid shelter expenses | 219,534 |
| Total | 2,495,168 |

Petitioner has not received this property because Mr. Bruno has persistently disregarded the orders of the divorce court, which has repeatedly held him in contempt and ordered him to pay interest on his unpaid obligations.[2] In August 2010 the divorce court transferred to petitioner title to one of the marital assets, a residence at 111 Spring Valley Road, Ridgefield, Connecticut (Spring Valley proper-

---

[2]Between 2008 and 2013 petitioner filed 29 motions for contempt against Mr. Bruno. The divorce court held him in contempt for failure to turn over marital assets on at least four occasions--in July 2010, December 2010, April 2015, and October 2015. In December 2010 and March 2011 the divorce court ordered that interest would accrue on Mr. Bruno's marital property debt. In March 2011 the divorce court commented that it "ha[d] never found a party to be more in contempt of court orders than this plaintiff [Mr. Bruno] has been."

[*5] ty).  The divorce court directed that the property be sold, with the first $300,000 of proceeds awarded to petitioner and the remainder to be placed in escrow.  Petitioner sold that property, apparently realizing proceeds of $1,902,890, but she declined to place proceeds in excess of $300,000 in escrow as the divorce court had ordered.  On April 6, 2015, the divorce court held her in contempt for that reason.

In October 2015 Mr. Bruno petitioned for chapter 7 bankruptcy in the U.S. Bankruptcy Court for the District of New Hampshire (bankruptcy court).  He sought to discharge (among other things) petitioner's claims against him for her share of the marital property.  Mr. Bruno asserted that he no longer possessed any of the marital property, alleging that his bankruptcy estate consisted of about $2,500 in miscellaneous assets and that he held claims against petitioner "per divorce decree" for the following:

| Claim | Amount |
|-------|--------|
| 50% of proceeds from Spring Valley property | $951,445 |
| 50% of proceeds from Pumping Station property | 119,900 |
| 50% of proceeds of bank account | 6,838 |
| Total | 1,078,183 |

**[*6]** B.        <u>Petitioner's Recovery Efforts</u>

Petitioner commenced or participated in a variety of actions aimed at recovering the marital property that Mr. Bruno owed her.  This litigation was well underway in early 2017, when petitioner filed returns claiming the theft loss at issue here.

In February 2016 petitioner filed a complaint in New Hampshire state court against Christina Bruno (the woman with whom Mr. Bruno had the affair and whom he later married) and several New Hampshire limited liability companies (New Hampshire LLCs).  The complaint alleged that Mr. Bruno and Christina Bruno conspired with the New Hampshire LLCs to conceal and convert marital property owed to petitioner under the divorce decree.  The complaint averred that Mr. Bruno was not named as a defendant because of his bankruptcy filing.

The complaint alleged (among other things) that Mr. Bruno had withdrawn most of the funds in the Charles Schwab joint account, in which petitioner claimed an interest of $1,292,609, and used these funds to purchase (and later sell at a profit) multiple pieces of real property titled in the name of the New Hampshire LLCs.  When the complaint was filed, one of the New Hampshire LLCs owned a residence at 64 Drinkwater Road, Hampton Falls, New Hampshire (Drinkwater

**[*7]** property).  It had allegedly been purchased for $825,000 and was then listed for sale at $995,000.

Petitioner alleged that she learned of Mr. Bruno's fraudulent scheme after the first meeting of creditors in his bankruptcy case, held in January 2016.  See 11 U.S.C. sec. 341(a) (2012).  During that meeting Mr. Bruno admitted during questioning by the bankruptcy trustee that Christina Bruno owned at least some of the New Hampshire LLCs and that he (Mr. Bruno) had signatory authority over their bank accounts.  After viewing the sales listing for the Drinkwater property, petitioner ascertained that it housed the marital property furniture in which she claimed an interest of $334,000.  In conjunction with her filing of the complaint, the New Hampshire state court awarded her a judicial lien against the Drinkwater property.

On October 26, 2016, petitioner filed a proof of claim in Mr. Bruno's bankruptcy case, contending that Mr. Bruno owed her $3,588,105 for "Domestic Support Orders/Alimony," all of which allegedly constituted a priority claim under 11 U.S.C. sec. 507(a)(1) (2012).  (This proof of claim covered roughly $2.5 million of marital property, plus alimony arrears and interest thereon, less the amount that petitioner owed to Mr. Bruno under the divorce decree.)  She reported that $200,000 of her claim was secured by a "Court-ordered injunction on funds depos-

**[*8]** ited with Schwab," stating that she had obtained this injunction against Mr. Bruno's mother. This injunction was issued by the Connecticut divorce court in July 2010, when petitioner moved to join Christina Bruno and Mr. Bruno's mother as parties to the divorce proceedings. The divorce court joined both of them as parties in March 2011.

On October 18, 2017, the bankruptcy trustee commenced an adversary proceeding against Mr. Bruno, Christina Bruno, Mr. Bruno's mother, the New Hampshire LLCs, and other persons and entities (collectively, adversary proceeding defendants). The complaint alleged fraudulent transfers and preferential transfers and sought to pierce the corporate veil. See 11 U.S.C. secs. 544, 547, 548 (2012). That case was settled in early 2019; petitioner signed the settlement agreement in her individual capacity on January 29, 2019.

The settlement of the adversary proceeding entitled petitioner to receive most of the proceeds from the sale of the Drinkwater property in exchange for releasing her lien against that property and her claims against all adversary proceeding defendants except Mr. Bruno. Petitioner thus agreed to dismiss with prejudice her New Hampshire state court action and to dismiss her claims in the Connecticut divorce proceeding against Christina Bruno and Mr. Bruno's mother. The settlement agreement expressly stated that the releases executed by petitioner should

[*9] not be construed in any way to "release, discharge or relieve the Debtor, Stephen Bruno from any and all claims held by * * * [petitioner] against him and/or his assets." On July 13, 2018, the bankruptcy court issued a notice of waiver of discharge, indicating that Mr. Bruno had waived his right to discharge of his liabilities in the bankruptcy case. See 11 U.S.C. sec. 727(a)(10) (2012).

In April 2019 the bankruptcy court issued a final judgment in the adversary proceeding, which incorporated by reference the settlement agreement. In June 2020 the bankruptcy trustee reported to the bankruptcy court that the Drinkwater property had been sold for $765,000. The trustee subsequently mailed petitioner a check for $450,000, representing her share of the sale proceeds.

## C.    Petitioner's Tax Reporting

Beginning with her return for 2008, petitioner has claimed (and the IRS has disallowed) an array of theft loss deductions (and related NOL carryforward deductions) connected with Mr. Bruno. On her 2008 return she claimed, and the IRS disallowed, total theft losses of roughly $12 million. One loss of approximately $10 million allegedly arose from a "conspiracy surrounding [Mr.] Bruno's 2006 termination from his then employer." The other, of more than $2 million, allegedly related to a conspiracy between Mr. Bruno and a homebuilder he had engaged to construct the Spring Valley property.

[*10] On her returns for 2013 and 2014 petitioner claimed and the IRS disallowed NOL carryforward deductions of $12,622,635 and $12,543,221, respectively. These carryforwards included an alleged 2012 loss attributable to an asserted "illegal transfer, conveyance and fraudulent concealment of * * * [Mr. Bruno's] LLC business interests." Petitioner concedes that she is not entitled to a theft loss on the theories asserted in her original returns for 2013 and 2014.

Petitioner first claimed a theft loss stemming from Mr. Bruno's failure to transfer marital property on Form 1040X, Amended U.S. Individual Income Tax Return, for 2015, which she filed in March 2017. The property allegedly stolen consisted of roughly $2.5 million of marital property that Mr. Bruno had not transferred to her. See supra pp. 3-4. She explained this theft loss as follows: "[U]nder the facts and circumstances of * * * [petitioner's] case, in which Mr. Bruno has declared bankruptcy (a fixed and identifiable event) and claims to have no assets including taxpayer's property there was not a reasonable prospect of recovery at the end of 2015 and this loss is allowable in 2015." The IRS processed petitioner's 2015 Form 1040X as a claim for a refund, which it denied.

On her return for 2016 petitioner claimed an NOL carryforward deduction of $21,185,374. This sum included the roughly $2.5 million theft loss reported on her 2015 Form 1040X at issue here. In a notice of deficiency dated May 14, 2018,

**[\*11]** the IRS determined (among other things) that petitioner was not entitled to any NOL carryforward or carryback deduction for 2013, 2014, or 2016. Petitioner timely petitioned for redetermination. The sole issue remaining for decision is whether petitioner suffered in 2015 (or in any other year at issue) a theft loss of $2,495,168, representing the value of marital property that Mr. Bruno has not transferred to her.

Discussion

## A.      Threshold Matters

Our jurisdiction in a deficiency case is generally confined to the years for which deficiencies have been determined in the notice of deficiency. See sec. 6214(a). With respect to certain items, such as NOL carryforward and carryback deductions, we may need to consider evidence from other tax years. See, e.g., Keith v. Commissioner, 115 T.C. 605, 621 (2000); Lee v. Commissioner, T.C. Memo. 2006-70, 91 T.C.M. (CCH) 999, 1001 (holding that a prior year return was insufficient by itself to establish an NOL in that prior year). As a rule, however, we have no power to determine an overpayment or underpayment of tax for a year not in issue. See sec. 6214(b); see also Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436, 440 (1974), aff'd, 510 F.2d 970 (3d Cir. 1975).

**[*12]** In a joint stipulation of facts filed in August 2019 petitioner made several concessions. Among other things, "[t]he parties agree[d] that the sole item at issue in this case is petitioner's claimed theft loss * * * and resulting net operating loss-es * * * relating to certain property which petitioner claims should have been paid or delivered to her by [Mr.] Bruno as a result of the divorce." In her opening brief petitioner likewise agreed that "the issue before this Court is whether the Commissioner wrongly disallowed [her] 2015 theft loss deduction and the resulting net operating loss."

After the parties filed their answering briefs, we directed them to file supplemental briefs addressing certain of the litigation matters discussed above. In her supplemental brief petitioner raised two new contentions. First, she urged that the $450,000 payment she received from the bankruptcy trustee in 2020 should be taxable for 2020 (and no sooner). Second, she urged that she is entitled to deduct, as expenses of generating that income, the costs she incurred in prosecuting the New Hampshire state court case and the adversary proceeding.

We will not entertain these contentions. Neither party argues that the $450,000 payment from the trustee is taxable to petitioner for 2013, 2014, or 2016 --the years at issue in this case--and we have no jurisdiction over 2020, a year for which petitioner has not yet filed a return. Petitioner does not contend that the liti-

**[\*13]** gation expenses to which she refers were deductible for 2013, 2014, or 2016. And even if she had advanced such a contention, we would not consider it because it is inconsistent with her prior stipulations and has been raised too late.[3]

B.      Burden of Proof

The IRS' determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The submission of this case under Rule 122 does not change or otherwise lessen petitioner's burden of proof. See Rule 122(b); Weaver v. Commissioner, 121 T.C. 273, 275 (2003).

Section 7491(a)(1) provides that, if "a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer \* \* \*, the Secretary shall have the burden of proof with respect to such issue." "Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted[.]" Higbee v. Commissioner, 116 T.C. 438, 442

---

[3]See Rules 91(e), 151(e); Levert v. Commissioner, T.C. Memo. 1989-333, 57 T.C.M. (CCH) 910, 917-918 (deeming an issue conceded when party did not raise it in his opening brief), aff'd without published opinion, 956 F.2d 264 (5th Cir. 1992); cf. Thomas v. Roach, 165 F.3d 137, 145-146 (2d Cir. 1999) (holding argument first raised in reply brief waived); Sinicropi v. Milone, 915 F.2d 66, 69 (2d Cir. 1990) ("A party to a stipulation is not entitled to withdraw from the agreement unilaterally[.]").

**[\*14]** (2001) (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994).

Any shift in the burden of proof under section 7491(a)(1) is subject to the limitations set forth in section 7491(a)(2). Among these limitations is that the taxpayer must have "maintained all records required under this title and ha[ve] cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews." Sec. 7491(a)(2)(B); see Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012). The taxpayer bears the burden of proving that she has met these requirements. See Rolfs, 135 T.C. at 483; Richardson v. Commissioner, T.C. Memo. 2005-143, 89 T.C.M. (CCH) 1446, 1448.

Petitioner makes brief references to section 7491(a) and urges that she "has introduced credible evidence before this Court with respect to a theft loss deduction." But she has not pleaded or argued that she satisfied all of the requirements set forth in section 7491(a)(2) as conditions for shifting the burden of proof. In any event, as we explain more fully below, we do not believe that petitioner has introduced "credible evidence" that she incurred a deductible theft loss in 2015.

**[\*15]** C.     Analysis

The Code allows individual taxpayers to deduct losses arising from theft that are sustained during the taxable year and not compensated by insurance or otherwise.  Sec. 165(a), (c)(3).  To establish a theft loss, a taxpayer must first prove the occurrence of a theft under the law of the relevant jurisdiction.  See Monteleone v. Commissioner, 34 T.C. 688, 692 (1960) ("For tax purposes, whether a theft loss has been sustained depends upon the law of the jurisdiction wherein the particular loss occurred."); Giunta v. Commissioner, T.C. Memo. 2018-180, 116 T.C.M. (CCH) 446, 450; Enis v. Commissioner, T.C. Memo. 2017-222, 114 T.C.M. (CCH) 552, 557 ("[T]he taxpayer must prove * * * that a theft actually occurred under the law of the relevant State * * * [or] under an applicable Federal criminal statute.").  The taxpayer must then establish the amount of the loss and the year in which the loss was sustained.  See sec. 1.165-1(c) and (d)(1), Income Tax Regs.  A loss arising from theft is generally treated "as sustained during the taxable year in which the taxpayer discovers such loss."  Sec. 165(e); see 1.165-1(d)(3), Income Tax Regs.

1.     Existence of a "Theft"

To establish a theft a taxpayer need not demonstrate a criminal conviction. See Monteleone, 34 T.C. at 694.  But she must prove by a preponderance of the

[*16] evidence that an actual theft occurred. See, e.g., Enis,114 T.C.M. (CCH) at 557 (citing Allen v. Commissioner, 16 T.C. 163, 166 (1951)). Petitioner contends that Mr. Bruno's actions constitute felony embezzlement under Connecticut law. See Conn. Gen. Stat. sec. 53a-119(1) (2016). Respondent agrees that Connecticut law controls and that embezzlement constitutes a "theft." See sec. 1.165-8(d), Income Tax Regs. (defining "theft" to include "embezzlement"). But respondent disputes that Mr. Bruno's actions amounted to felony embezzlement under Connecticut law. We share respondent's concern.

Embezzlement was not a punishable offense at common law, and Connecticut courts recognize it as a crime "only as and to the extent that the Legislature has by statute provided." State v. Parker, 151 A. 325, 328 (Conn. 1930). Under Connecticut law, "[a] person commits embezzlement when he wrongfully appropriates to himself or to another property of another in his care or custody." Conn. Gen. Stat. sec. 53a-119(1).

Petitioner contends that she became the owner of her share of the marital property on March 17, 2008--the date on which the divorce court issued the divorce decree. But petitioner does not address when or how Mr. Bruno "appropriate[d]" this property. She instead suggests that a theft occurred when the property was "dissipated" by Mr. Bruno or when Mr. Bruno evinced a "willful (and suc-

[*17] cessful) attempt to deprive Petitioner of her property." According to petitioner, this willful attempt was manifested when the divorce court "repeatedly sanctioned Mr. Bruno and held him in contempt."

We question petitioner's interpretation of Connecticut law. Connecticut appears to treat the unpaid amount of a marital property settlement as a debt of the delinquent spouse. An order of the divorce court directing one party to pay the other a sum certain is considered a "money judgment." Conn. Gen. Stat. sec. 52-350a(13) (2016); Profetto v. Lombardi, 137 A.3d 922, 924 (Conn. App. Ct. 2016); Niles v. Niles, 546 A.2d 329, 330 (Conn. App. Ct. 1988). Accordingly, Connecticut courts order interest on the unpaid amount of a judgment in a domestic action, as the divorce court here did at petitioner's request, as a sanction against the defaulting spouse. See Dowd v. Dowd, 899 A.2d 76, 84 (Conn. App. Ct. 2006) ("When a former spouse is not justified in failing to pay sums due * * * , the award of interest is proper." (quoting LaBow v. LaBow, 537 A.2d 157, 169 (Conn. App. Ct. 1988))); see also Sosin v. Sosin, 14 A.3d 307, 331 (Conn. 2011) (affirming award of post-judgment interest where husband withheld a portion of a lump-sum payment due as part of divorce judgment).

Failure to transfer marital property is not an uncommon occurrence. Petitioner points to no caselaw or other Connecticut authority establishing that an ex-

[*18] spouse commits embezzlement when he is held in civil contempt for failing to pay a marital property debt. Indeed, petitioner was herself held in contempt by the divorce court for her refusal to place in escrow Mr. Bruno's $951,445 share of the proceeds from sale of the Spring Valley property. See supra p. 5. We doubt petitioner believes that she embezzled those funds, and it is not obvious that civil contempt orders directed against her ex-husband should produce a different result.

Moreover, petitioner's theory of embezzlement would make it difficult to ascertain the year in which the loss was sustained. As petitioner emphasizes, the divorce court held Mr. Bruno in contempt on numerous occasions over the course of several years. On petitioner's theory we would have to decide which of those orders, alone or in combination, sufficed to establish that Mr. Bruno had committed "embezzlement." And many of those orders were issued before 2015, the year of the alleged theft. See supra note 2.

2.  Year in Which Sustained

We need not decide in this case the outer limits of Connecticut criminal law. Assuming without deciding that Mr. Bruno committed a theft of marital property, we find that petitioner is not entitled to a deduction unless she can establish the amount of the loss and the year in which it was sustained. See sec. 1.165-1(c)

[*19] and (d)(1), Income Tax Regs.  Petitioner has not established that she sustained a theft loss for 2015 (or any other year at issue).

A theft loss is generally treated as sustained in the year "in which the taxpayer discovers such loss."  Sec. 165(e); sec. 1.165-1(d)(3), Income Tax Regs.  "However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained * * * until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received."  Sec. 1.165-1(d)(3), Income Tax Regs.; see also id. sec. 1.165-8(a)(2).

"A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor."  Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811 (1974), aff'd, 521 F.2d 786 (4th Cir. 1975).  This evaluation should not be made "through the eyes of the 'incorrigible optimist.'"  Ibid. (quoting United States v. S.S. White Dental Mfg. Co. of Pa., 274 U.S. 398, 403 (1927)).  Thus, "[t]he mere possibility or the bare hope of a future development permitting recovery does not bar the deduction of a loss clearly sustained."  Gottlieb Realty Co. v. Commissioner, 28 B.T.A. 418, 420 (1933).

[*20] Whether a taxpayer had a reasonable prospect of recovery at the end of a particular year "is a question of fact to be determined upon an examination of all facts and circumstances." Sec. 1.165-1(d)(2)(i), Income Tax Regs.; see Ramsay Scarlett, 61 T.C. at 811. While "[t]he taxpayer's attitude and conduct are not to be ignored," Boehm v. Commissioner, 326 U.S. 287, 293 (1945), the standard to be applied is primarily an objective one, see Ramsay Scarlett, 61 T.C. at 811-812. When a taxpayer undertakes the trouble and expense of seeking to recover an alleged loss through litigation, courts have often inferred that he or she had a reasonable prospect of recovery. See, e.g., Dawn v. Commissioner, 675 F.2d 1077, 1078-1079 (9th Cir. 1982) (noting that litigation created an inference of recovery not negated by the fact that the litigation was unsuccessful), aff'g T.C. Memo. 1979-479; Jeppsen v. Commissioner, T.C. Memo. 1995-342, 70 T.C.M. (CCH) 199, 201, aff'd, 128 F.3d 1410 (10th Cir. 1997).

As of year-end 2015 petitioner already had in her possession $1,078,183 of marital property that she owed Mr. Bruno. She concedes that she has "a reasonable prospect of recovering * * * [that sum] as an offset to the total theft loss at issue." She had commenced litigation against Christina Bruno and Mr. Bruno's mother in March 2011 by joining them as parties in the divorce proceeding, which was on-going at year-end 2015. She had obtained against Mr. Bruno's mother in

[*21] the divorce action an injunction that secured her claim to an additional $200,000 of marital property. At year-end 2015, therefore, petitioner had effectively recovered $1,278,183 of marital property and had commenced litigation against Mr. Bruno, Christina Bruno, and Mr. Bruno's mother to recover the balance.

Mr. Bruno filed for bankruptcy in October 2015, and petitioner relies heavily on the assertion in his bankruptcy petition that he then had (apart from his claims against her) assets of only $2,500. We do not think that a reasonable person in petitioner's position would have believed that assertion. Mr. Bruno was a successful financial professional whose annual income exceeded $2.1 million before the divorce. At the time of the divorce he held assets of at least $5 million, corresponding to his and petitioner's share of the marital property. Given Mr. Bruno's profile as someone who repeatedly ignored judicial orders, the assertion that he had essentially no assets in October 2015 was objectively implausible. And it is obvious that petitioner did not believe that assertion, because she proceeded to file a proof of claim against him in bankruptcy court, to file additional claims against Christina Bruno in New Hampshire state court, and to participate in the bankruptcy trustee's adversary proceeding against Mr. Bruno, Christina Bruno, and Mr. Bruno's mother.

**[*22]** Petitioner notes that she did not discover where Mr. Bruno may have hidden his assets until January 2016, after the first meeting of his bankruptcy creditors. But she had already commenced litigation against two of his plausible accomplices--Christina Bruno and Mr. Bruno's mother--by joining them as parties to the divorce case in 2011. The fact that petitioner did not know in December 2015 exactly where Mr. Bruno had hidden his assets does not negate the fact that she had, at that time, "a reasonable prospect of recovery," from a variety of sources, on her existing claims for recoupment. See sec. 1.165-1(d)(3), Income Tax Regs.

Within a few months after the close of 2015, petitioner secured a lien on the Drinkwater property, which was then listed for sale at $995,000. It appears that petitioner ultimately recovered, in 2020, only $450,000 as a result of her litigation against Christina Bruno and Mr. Bruno's mother. But we do not think petitioner could reasonably have anticipated, at year-end 2015, this lesser recovery against those parties. And she retained at that date all of her claims against Mr. Bruno in the divorce case and against his estate in the bankruptcy case, both of which remained ongoing for several years.

In sum, we conclude that petitioner in December 2015 had "bona fide claims for recoupment" from Mr. Bruno and his co-defendants and that there was "a substantial possibility that such claims w[ould] be decided in * * * [her] favor."

[*23] <u>Ramsay Scarlett</u>, 61 T.C. at 811.  Because petitioner had "a claim for reimbursement with respect to which there [wa]s a reasonable prospect of recovery," no portion of her alleged loss is deemed sustained "until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received."  <u>See</u> sec. 1.165-1(d)(3), Income Tax Regs.; <u>see also</u> <u>id.</u> sec. 1.165-8(a)(2).  Reasonable certainty on that point could not exist until some time after December 31, 2016, the end of the last taxable year at issue here.

      To implement the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.
